UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES B. NEWPORT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 1:15-cv-00366-DML-JMS |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of the Social Security, ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

## Decision on Judicial Review

James B. Newport applied in October 2012 for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, alleging that he became disabled beginning January 1, 2012, as a result of ischemic heart disease, status-post bypass surgeries, status-post implantation of Implantable Cardioverter Defibrillator ("ICD") device, and degenerative changes to the lumbar spine. Acting for the Commissioner of the Social Security Administration following a video hearing held on March 5, 2014, administrative law judge Mary F. Withim issued a decision on September 2, 2014, denying benefits to Mr. Newport. The Appeals Council denied review of the ALJ's decision on January 12, 2015, rendering the ALJ's decision for the Commissioner final. Mr. Newport timely filed this civil action under 42 U.S.C. § 405(g) for review of the Commissioner's decision. Finding that the ALJ's reasons for discounting Mr. Newport's credibility do not withstand scrutiny, this court remands.

## **Standard for Proving Disability**

To prove disability, a claimant must show that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Mr. Newport is disabled if his impairments are of such severity that he is not able to perform the work he previously engaged in and, if based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration ("SSA") has prescribed a "five-step sequential evaluation process" for determining disability. 20 C.F.R. § 404.1520(a)(4). The first step inquires as to whether the claimant is currently engaged in substantial gainful activity; if so, then he is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or medically equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments includes medical conditions defined by

criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity ("RFC") is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 404.1545. At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on his vocational profile (age, work experience, and education) and his RFC; if so, then he is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity. 20 C.F.R. § 404.1560(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

### **Standard of Review of the ALJ's Decision**

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are

supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands more than a scintilla of evidentiary support but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001).

The ALJ is required to articulate a minimal, but legitimate, justification for her decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). The ALJ need not address every piece of evidence in her decision, but she cannot ignore a line of evidence that undermines the conclusions she made, and she must trace the path of her reasoning and connect the evidence to her findings and conclusions. *Arnett v. Astrue,* 676 F.3d 586, 592 (7th Cir. 2012); *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## The ALJ's Sequential Findings

Mr. Newport was born in 1953 and was 58 years old on January 1, 2012, the onset date of his alleged disability. Mr. Newport has at least a high school education and past relevant employment experience as a senior project engineer in the automotive industry. In 1982, Mr. Newport experienced a heart attack and subsequent coronary bypass surgery. In 1996, he blacked out briefly while running and, after testing revealed blocked arteries, underwent another bypass surgery. Mr. Newport has an implantable cardioverter defibrillator ("ICD").[1] At a routine

---

[1] An implantable cardioverter-defibrillator ("ICD") is a sophisticated device used primarily to treat ventricular tachycardia and ventricular fibrillation, two life-threatening heart rhythms. The ICD constantly monitors the heart rhythm. When

checkup in 2011, Mr. Newport's diagnoses included congestive heart failure, coronary artery disease, ischemic cardiomyopathy, and arrhythmia; he complained of—among other things—increased fatigue and occasional shortness of breath. A 2013 echocardiogram revealed some abnormalities: the left ventricular cavity size was increased, the left atrium was dilated, and his ejection fraction was 40-45%.[2]

At step one, the ALJ found that Mr. Newport had not engaged in substantial gainful activity during the period from his alleged onset date of January 1, 2012, through his date last insured of December 31, 2013. At step two, she identified numerous severe impairments, including ischemic heart disease, status-post bypass surgeries in 1982 and 1996, status-post implantation of ICD device, and degenerative changes to the lumbar spine. At step three, the ALJ found that none of the severe impairments, singly or in combination, met or medically equaled a listing. The ALJ next determined Mr. Newport's RFC, finding that through the date last insured, Mr. Newport had the capacity to perform sedentary work as defined at 20 C.F.R. § 404.1567(b), with further refinements allowing him to sit or

---

it detects a very fast, abnormal heart rhythm, it delivers energy to the heart muscle to cause the heart to beat in a normal rhythm again. *See* http://answers.webmd.com/answers/1176666/what-is-an-implantable-cardioverter-defibrillator-icd?guid=1 (last visited March 30, 2016).

[2] The ejection fraction is a measurement of the heart's efficiency and can be used to estimate the function of the left ventricle, which pumps blood to the rest of the body. The left ventricle pumps only a fraction of the blood it contains. The ejection fraction is the amount of blood pumped divided by the amount of blood the ventricle contains. A normal ejection fraction is more than 55% of the blood volume. *See* http://www.webmd.com/hw-popup/ejection-fraction (last visited March 30, 2016).

5

stand alternatively at will provided that he is not off task more than 5% of the work period, and only occasionally to stoop, kneel, crouch, and crawl. With this RFC and based on the ALJ's review of testimony of a vocational expert ("VE"), the ALJ found at step four that that Mr. Newport, through the date last insured, was capable of performing his past relevant work as a project engineer. Accordingly, the ALJ found at step four that Mr. Newport is not disabled.

## Analysis

In formulating Mr. Newport's RFC, the ALJ found that Mr. Newport's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Mr. Newport's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible for several reasons, discussed below. On appeal, Mr. Newport attacks the ALJ's negative credibility determination on multiple grounds. First, Mr. Newport attacks the decision generally, contending that an ALJ must address all seven factors listed in SSR 96-7p, that the use of boilerplate language is reversible error, and that the decision lacks the necessary level of articulation. Next, he argues that the ALJ's analysis of Mr. Newport's activities and level of functioning are insufficient and erroneous and that the ALJ made "flawed and illogical" conclusions regarding Mr. Newport's 2008 lay-off from the workforce. The court addresses each argument in turn.

**A.     The ALJ's Decision Generally**

Mr. Newport contends initially that the ALJ erred in failing to consider all seven factors listed in Social Security Ruling 96-7p in assessing the credibility of his statements, that the ALJ's use of boilerplate language is reversible error, and that the decision generally "is devoid of the necessary and mandated level of articulation required to show that the reasoning forms 'an accurate and logical bridge between the evidence and the result.'" Dkt. 12 at p. 13 (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

SSR 96-7p prescribes the appropriate process for evaluating credibility and requires an ALJ to consider a claimant's subjective complaints in light of the relevant objective medical evidence, as well as any other pertinent evidence regarding: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of medication; (5) treatment, other than medication; (6) any measures other than treatment the individual uses or has used; and (7) any other factors concerning the individual's functional limitations and restrictions. *See also* 20 C.F.R. §404.1529(c)(3). But it is not necessary that the ALJ recite findings on every factor listed in SSR 96-7p, or that she discuss every piece of evidence that might bear on credibility; it is "enough that in view of the record as a whole, the ALJ's determination rests on substantial evidence." *Sawyer v. Colvin*, 512 Fed. Appx. 603 at *5 (7th Cir. 2013) (unpublished) (*citing Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003)); *Erwin v. Astrue*, 2009 WL 2762840 at *7 (S.D. Ind. Aug. 27, 2009) ("It is not necessary for the ALJ to

7

recite findings on each factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed.").

Mr. Newport further asserts that the ALJ's use of boilerplate language—in particular, the statement that Mr. Newport's symptoms are "not entirely credible"— is reversible error. The use of boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if she otherwise points to information that justifies her credibility determination. *See Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). Finally, the court rejects Mr. Newport's generalized argument that the decision as a whole is devoid of the level of articulation required to form "an accurate and logical bridge between the evidence and the result." Dkt. 12 at p. 13. The court observes that Mr. Newport has pointed to nothing specific, such as a certain critical factor or piece of evidence the ALJ erroneously failed to consider. That said, the discussion below details why the ALJ's reasoning underlying her assessment of Mr. Newport's credibility requires remand.

## B. The ALJ's Credibility Assessment

Mr. Newport next argues that the ALJ's specific reasons for discounting his credibility do not withstand scrutiny. The court agrees.

An ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). We overturn a credibility determination only if it is patently wrong. *Id.*

The determination of credibility must contain specific reasons for the credibility finding, must be supported by the evidence, and must be specific enough to enable the claimant and a reviewing body to understand the reasoning. *Id.* (*citing* SSR 96-7p). An ALJ must evaluate a claimant's subjective complaints or statements about his symptoms if the claimant has a medically determined impairment that could reasonably be expected to produce that symptom. *See id.* (*citing* 20 C.F.R. §404.1529(c)(1)).

Here, the ALJ determined that Mr. Newport's medically determined impairments could reasonably be expected to cause the symptoms he complained of, but that his statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely credible." Dkt. 9-2 at p. 22. In particular, the ALJ cited three principal grounds for questioning the credibility of Mr. Newport's statements. The court will now address each of these in turn.

1. <u>Mr. Newport's Activity Level</u>

First, the ALJ stated, as an "initial matter," that Mr. Newport is "more active than one would expect of a disabled individual." Dkt. 9-2 at p. 23. "He lives independently, maintains his residence, drives, and shops. He takes few medications, and he testified that he does not experience side effects from the medications he does take." Dkt. 9-2 at p. 23. Later in the decision, the ALJ noted that "in fact" a treatment record dated June 2012—an Office Consult with Dr. John McGinty—states that Mr. Newport was "quite active for his age." *See* Dkt. 9-2 at p. 23 (*citing* Dkt. 9-7 at p. 44).

9

Yet the testimonial evidence the ALJ set forth in her decision painted a rather different picture of Mr. Newport's energy level. "He stated that reduced ventricular function has resulted in chronic fatigue that worsens when he experiences occasional arrhythmias" and that "his chronic fatigue progressed to the point that in 2012, he realized that he no longer had the energy or stamina to sustain full-time employment." Dkt. 9-2 at p. 23. The ALJ's decision went on to say:

> When asked to describe a typical day, the claimant responded that he has the most energy in the morning, so he tries hard to accomplish errands and chores at that time of day; he stated that by 1:00 or 2:00 p.m., he generally has become very fatigued, and must spend the remainder of the afternoon resting.

Dkt. 9-2 at p. 23.

It is well established that there is a critical difference between activities of daily living and activities in a full-time job, namely that a person has more flexibility in scheduling the former than the latter, can get help from other persons, and is not held to a minimum standard of performance, as she would be by an employer. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Here, in support of her assertion that Mr. Newport is "more active than one would expect of a disabled individual," the ALJ listed several basic activities of daily living, along with the observation that Mr. Newport takes few medications and experiences no side effects from the medication he does take. Dkt. 9-2 at p. 23. But nothing in this list suggests an activity level necessarily inconsistent with disability, particularly if, as Mr. Newport testified, he attends to these tasks in the morning to make the most

10

of his limited energy. The ALJ's opinion lacks an explanation for why she makes so much of Dr. McGinty's statement that Mr. Newport was "quite active for his age," which was offered without elaboration or support in the notes of a June 2012 Office Consult. Significantly, Dr. McGinty himself did not appear to attach relevant import to it when he completed the Cardiac Residual Functional Capacity Questionnaire in 2014, which, among other things, opined that Mr. Newport would likely miss about three days of work per month because of his condition. *See* Dkt. 9-7 at p. 61.

2.   The Medical Records and Opinion Evidence

The ALJ went on in her decision to consider Mr. Newport's medical records and the opinion evidence. As to the former, the ALJ acknowledged that Mr. Newport has a long history of heart disease dating back to his late twenties, that his disease has resulted in reduced heart function, and that a 2013 echocardiogram confirmed the existence of some abnormalities. These abnormalities included the following: the left ventricular cavity size was increased, the left atrium was dilated, and a visual estimation of the ejection fraction was 40-45%. *See* Dkt. 9-7 at p. 55. The ALJ also wrote that "[t]here is no question that heart disease can cause fatigue and discomfort, but the evidence does not demonstrate that the claimant's symptoms are as debilitating as he has described." Dkt. 9-2 at p. 23. The ALJ then listed symptoms Mr. Newport had *not* experienced, according to the medical records, including "no chest discomfort, palpitations, breathing difficulties, syncope

11

or near syncope" and (as of February 2014[3]), "no complaints of angina, shortness of breath, or chest discomfort."  Dkt. 9-2 at p. 23.  The court notes, however, that whether Mr. Newport experienced the symptoms listed above does not address whether he experienced the chief symptom of which he complained: chronic fatigue and lack of stamina.  *See e.g.*, Dkt. 9-2 at p. 38 (Mr. Newport's testimony that "[He's] just gotten to a point where [he] just ha[s] no energy to function basically."); Dkt. 9-7 at p. 29 ("He reports some increased fatigue . . . ."); Dkt. 9-7 at p. 66 ("He is chronically fatigued but has no other complaints."); Dkt. 9-7 at p. 71 ("He reports lack of stamina—which he has had for years.  Most tasks 'wear him out.'").

As for the opinion evidence, the ALJ stated that she gave little weight— notwithstanding his treatment relationship with Mr. Newport—to the opinion of Dr. McGinty set forth in the Cardiac Residual Functional Capacity Questionnaire, which she summarized in relevant part as follows:

> Dr. McGinty stated that the claimant suffered from occasional shortness of breath with exertion and increased heart palpitations with stress.  He expressed his opinion that the claimant could stand and walk less than two hours a day . . . and that he likely would be absent from work about three days a month due to his symptoms.

Dkt. 9-2 at p. 24 (*referring to* Dkt. 9-7 at p. 58).  As to why she gave his opinion little weight, the ALJ stated that Dr. McGinty's opinion was inconsistent with the "mild and normal objective findings discussed above"—referring apparently to medical evidence gathered during routine follow-up visits with Dr. McGinty—and because

---

[3]     In the notes from this February 2014 office visit, Dr. McGinty wrote, "He is chronically fatigued but has no other complaints."  *See* Dkt. 9-7 at p. 65.

12

Dr. McGinty's assessment "does not point to any findings demonstrating that the claimant is as limited as he describes." Dkt. 9-2 at p. 24.

The ALJ gave "some weight" to the opinions of the State agency medical consultants, who in February 2013 "thoroughly reviewed the record" and concluded that Mr. Newport could perform light work, and who later affirmed that opinion at the reconsideration level. As the ALJ summed up her assessment of these opinions, "In view of the evidence that the claimant is independent, active, and generally asymptomatic, the State consultants' conclusions that he can perform light work are quite reasonable." Dkt. 9-2 at p. 24. The court is not sure what the ALJ meant by saying that Mr. Newport is "independent," but her characterization of Mr. Newport as "active" (as discussed above) and "asymptomatic" is not a logical analysis. In sum, the ALJ's discussion of the medical records and opinion evidence provides no specific, supportable, reviewable basis for finding Mr. Newport's subjective complaints of chronic fatigue and lack of stamina not credible. *See Craft*, 539 F.3d at 678.

3.   Mr. Newport's 2008 Lay-Off

Finally, the ALJ mentioned more than once in her decision that Mr. Newport's last job as a project engineer ended in 2008 from a workforce reduction. She wrote that Mr. Newport "returned to work after his last catheterization in 2007, and he stopped working only because he was laid off[.]" Dkt. 9-2 at p. 23. The ALJ went on to write, "These facts certainly are not dispositive of his claim, but they do raise a question as to whether his current lack of employment is due to his

13

impairments or other factors." Dkt. 9-2 at p. 23.  And at the hearing, the following colloquy occurred:

> [ALJ]: It sounds to me like, you know, had they not laid you off, you would have kept going.  So what is it that's different now since January, 2012?
>
> [Mr. Newport]:  Well, again it's congestive heart failure is what I have.  And you know, that's degenerative in nature.  And I've just gotten to a point where I just have no energy to function basically.
>
> [ALJ]:  Okay.  So your energy levels have dropped even since you stopped working?
>
> [Mr. Newport]:  Absolutely.

Dkt. 9-2 at p. 38.

In light of the fact that Mr. Newport did not even file for disability benefits until 2012—which seems entirely consistent with his claim that his condition is degenerative—the court does not find that the ALJ was warranted in making so much of Mr. Newport's having been laid off back in 2008.  If anything, this appears to the court to cut the other way—Mr. Newport did not apply for disability benefits the day after he was laid off; rather, he applied four years later, when, as he says, his condition had progressed to the point that he no longer believed he had the stamina and energy to maintain employment.  In short, the court does not find Mr. Newport's 2008 lay off to be a tenable, logical reason for questioning Mr. Newport's credibility.

The court concludes that the ALJ did not articulate any logical basis for calling into question the severity of Mr. Newport's chief subjective complaint: his

chronic fatigue and lack of stamina. Finding that the ALJ's reasons for discounting Mr. Newport's credibility do not withstand scrutiny, the court remands.

## Conclusion

For the foregoing reasons, the court REMANDS the Commissioner's decision that Mr. Newport is not disabled.

So ORDERED.

Dated: March 31, 2016

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record by email through the court's ECF system